**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Jamal Atalla,

           Petitioner,

vs.

John Kramer, District Director of United States Citizenship and Immigration Services, and United States Citizenship and Immigration Services,

           Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CV09-1610-PHX-NVW

**FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER**

Petitioner is before the Court seeking *de novo* review, pursuant to 8 U.S.C. § 1421(c), of the April 9, 2009 decision of United States Customs and Immigration Services ("USCIS") denying his application for naturalization. The Court conducted an evidentiary hearing on Petitioner's application on April 5, 6, 7, and 8, 2011. This order states the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.    Findings of Fact**

      **A.    Biographical Information**

Petitioner Jamal Atalla, M.D. ("Dr. Atalla") is a native of Syria, born of Palestinian parents, who currently lives in Phoenix, Arizona. Dr. Atalla is a licensed healthcare provider specializing in interventional nephrology.

In 1991, Dr. Atalla graduated from the Damascus University School of Medicine in Damascus, Syria. In 1992, he entered the United States as a student to continue his

medical education.  Subsequently, Dr. Atalla completed an internship in internal medicine at the University of New York, Buffalo, New York, and a medical residency at the University of Kentucky at Lexington.  Then he worked as a physician providing care to underserved populations in Martin, Kentucky, completed a nephrology and hypertension fellowship at the University of Missouri, worked as a nephrologist for Indiana Nephrology in Richmond, Indiana, completed an interventional nephrology fellowship with the Arizona Kidney Disease & Hypertension Center ("AKDHC") in Phoenix, Arizona, and has been continuously employed by AKDHC as an interventional nephrologist for the past five years.  He is board certified in internal medicine and nephrology.  Also, he has been certified by the American Society of Diagnostic and Interventional Nephrology since 2007.  Dr. Atalla is a member of numerous professional organizations, including the American Society of Nephrology, the National Kidney Foundation, and the Syrian American Medical Society.

Dr. Atalla moved to the United States with his wife, Nadia Katrangi, who had also obtained a medical doctorate and a degree in clinical pathology from a university in Syria and would later earn a master's degree in biochemistry and molecular biology from Wright State University in Ohio.  Dr. Atalla and his wife became permanent residents of the United States in 1997.  In May 2002, they filed applications to become naturalized citizens of the United States, and Dr. Atalla's wife became a naturalized citizen when her application was approved.

Dr. Atalla and his wife are the parents of four children, all of whom were born in the United States and are United States citizens.  Their oldest son is named Yousef and named after Dr. Atalla's father.  Dr. Atalla is sometimes referred to as Abu Yousef (meaning "father of Yousef"), which is a common Muslim custom.  Dr. Atalla's parents currently reside in Damascus, Syria, and he has sent money to them from the United States.  Dr. Atalla traveled to Syria in 1997, 2000, 2003, 2004, 2005, and 2006 and to Saudi Arabia in 1998.

Dr. Atalla is a practicing Muslim, an active member of his mosque, and active in the Islamic community in Phoenix, Arizona.  He and his family routinely volunteer at soup kitchens and visit the elderly in nursing homes.  Dr. Atalla has, on a regular basis, volunteered as a physician at the medical clinic located at the Cultural Food Bank in Phoenix, Arizona.  He also provides nephrology services at free clinics in various parts of Arizona and treats indigent patients at Maricopa County Medical Center.

In addition, Dr. Atalla serves on the Board of Directors for the Muslim Youth Center for Arizona, which provides educational and sports activities for youth.[1]  He also serves on the Board for the Arizona Cultural Academy, which is a private Islamic school that teaches academics to pre-kindergarten through twelfth grade students and in which his children are enrolled.  Further, Dr. Atalla has coordinated efforts to educate youth about smoking, alcohol, and drug abuse and has volunteered with the Muslim American Society, an American organization to promote Islamic understanding among youth, by mentoring and working in shelters and soup kitchens.

Over the years, Dr. Atalla and his wife have donated money to approximately sixty different charitable organizations.  Charitable giving, known as *zakat*, is one of the core principles of Islam and includes donating time and skills, in addition to money, to help the less fortunate.  Dr. Atalla has practiced *zakat* as part of his faith for many years.  He has often donated to a charitable organization because of a solicitation he has heard at a faith center.

**B.**     **Dr. Atalla's Involvement with the Global Relief Foundation and Other Organizations**

Beginning in 1997, Dr. Atalla regularly made small donations and occasionally made larger donations to the Global Relief Foundation, which had its headquarters in

---

[1]The deposition transcript of Sabahudin Ceman, Director of the Muslim Youth Center for Arizona, was admitted as exhibit 232, subject to the objections stated therein. The objections are considered and overruled.

1   Chicago, Illinois, and provided charitable relief to refugees.  He estimates that he donated

2   a total of approximately $25,000 to $30,000 to the Global Relief Foundation.  He was not

3   a member or employee of the Global Relief Foundation and does not believe that his

4   donations to or involvement with the Global Relief Foundation constituted being

5   "associated" with it.

6        Over time, Dr. Atalla became friends with Mohamad Chehade, Ph.D., then-

7   executive director of the Global Relief Foundation.  He met with Dr. Chehade several

8   times in Chicago and communicated with Dr. Chehade by telephone every couple of

9   months over the years.  Dr. Chehade had considered asking Dr. Atalla to serve on Global

10  Relief Foundation's board, but did not.

11       In 2000, Dr. Atalla helped raise funds and collect medicine and medical equipment

12  to establish a medical clinic in Baku, Azerbaijan, to be operated by the Global Relief

13  Foundation.  He spent approximately three weeks in Baku helping to establish the clinic.

14  He was not paid for any of his efforts related to the Global Relief Foundation.

15       In January 2000, Dr. Atalla contacted Dr. Chehade to volunteer his services as a

16  doctor to provide relief to refugees in the area of Chechnya.  In February 2000, Dr. Atalla

17  called Dr. Chehade to discuss whether another person with an American passport, who

18  would bring medicine and possibly a portable x-ray machine, should go to Baku,

19  Azerbaijan, or to Georgia.  Dr. Atalla indicated that he hoped to go to Baku later and said

20  they would travel at their own expense.  He also asked Dr. Chehade about obtaining a

21  charitable discount for medicines they would bring and about obtaining donated medicine

22  for refugees in Baku.

23       In March 2000, Dr. Atalla called Dr. Chehade and further discussed providing

24  medical services in Baku.  Dr. Chehade told Dr. Atalla that the Azerbaijan hospitals only

25  permit doctors under contract to provide medical services in the hospitals, but outpatient

26  services could be provided in a medical clinic.  Dr. Chehade said that most of the

27  wounded were moved from Georgia to Azerbaijan, and the Global Relief Foundation did

28                              - 4 -

not have a clinic in Azerbaijan, but could establish one.  Dr. Atalla said he intended to
establish a small clinic for the poor and underprivileged in Azerbaijan and to reside there,
but he wanted Dr. Chehade to keep his intentions confidential.  Dr. Atalla also told Dr.
Chehade that he was collecting funds in the name of the Islamic center that were to be
transferred through Global Relief Foundation and entirely used for relief work, *i.e.*, the
donors did not want any administrative fees to be deducted from the donation.  Dr.
Chehade agreed to Dr. Atalla's terms.

In April 2000, Dr. Atalla attended a meeting in Chicago for an organization called
Doctors for Global Relief.  The Global Relief Foundation sent a representative to that
meeting.

On May 15, 2000, Dr. Atalla went to Baku, Azerbaijan, and he returned to the
United States on June 3, 2000.  While there, he interviewed doctors, a dentist, a
pharmacist, and other staff being considered for positions at the medical clinic that was to
be funded by the Global Relief Foundation and operated by a local foundation.  He
recorded the interviews, took photographs, and wrote a report, which he gave to Dr.
Chehade.  Dr. Atalla did not participate in any hiring decisions.

Although Dr. Atalla had considered returning to the Baku clinic on a regular basis,
soliciting other doctors to volunteer their services there, and collecting more medicine for
the clinic, that plan did not happen.  At one point, in fact, he resigned from his full-time
medical position and continued an additional part-time job so that he could devote more
of his time to volunteer relief work.  However, after a brief leave of absence, he returned
to his full-time medical position.  After Dr. Atalla's trip to Baku, he provided only two
programs, *i.e.*, presentations, at mosques to raise funds for the Global Relief Foundation's
medical work.

In June 2000, Dr. Atalla went to Tampa, Florida, to raise funds for the Global
Relief Foundation.  The Global Relief Foundation paid Dr. Atalla's airfare and hotel
expense.  After presenting his fundraising program to the congregation at a local mosque,

1   Dr. Atalla met with a group of doctors to solicit donations of funds and medical
2   equipment for the Baku clinic.

3          In July 2000, Dr. Atalla questioned Dr. Chehade about accusations that the Global
4   Relief Foundation had lost one million dollars.  Dr. Atalla thought perhaps the money had
5   disappeared because of mismanagement before Dr. Chehade became in charge, but Dr.
6   Chehade assured Dr. Atalla that never in its history had the foundation lost a million
7   dollars.  Dr. Chehade told Dr. Atalla that since the foundation was established, not one
8   dollar had been lost.  He further explained that at one point in the past, the Global Relief
9   Foundation had been in debt for $100,000, but the money was not lost.  He said it was not
10  a matter of integrity, but rather a matter of bad management.  Also, Dr. Atalla urged Dr.
11  Chehade not to procrastinate regarding obtaining an ambulance for the Baku medical
12  clinic.

13         In May 2001, Dr. Atalla attended a Global Relief Foundation conference in
14  Chicago as a guest of the organization.  Employees, representatives, officers, directors,
15  and some volunteers met to discuss the future of the Global Relief Foundation.

16         In November 2001, after the events of September 11, Dr. Atalla was aware that
17  people were apprehensive about donating to charitable relief organizations like the Global
18  Relief Foundation, and he had heard that the government may begin freezing the assets of
19  some organizations.  Dr. Chehade assured Dr. Atalla that the Global Relief Foundation
20  was working with the American embassy in Islamabad, the World Food Program, and the
21  United Nations refugee agency, and that its programs were legal.

22         On December 14, 2001, the FBI searched the headquarters of the Global Relief
23  Foundation and Dr. Chehade's home.  Also on December 14, 2001, the Department of
24  Treasury froze the Global Relief Foundation's assets.

25         In December 2001, Dr. Atalla became aware of accusations that the Global Relief
26  Foundation had ties to terrorism.  Dr. Atalla did not believe that Dr. Chehade and the
27  Global Relief Foundation were involved in terrorism.  In April and July 2002, Dr. Atalla

28

made two donations to GRF's legal defense fund.  Dr. Atalla did not make any financial contributions to the Global Relief Foundation after July 2002.

On October 18, 2002, the United States designated the Global Relief Foundation as a terrorist organization.  On October 22, 2002, the Global Relief Foundation's assets were frozen according to United Nations Security Council Resolutions 1267 and 1390.  As early as 2000, the FBI had concluded that, although a majority of Global Relief Foundation funding went toward legitimate relief operations, a significant percentage was diverted to fund extremist causes.  FBI agents believed the Global Relief Foundation had links to the Al Qaeda organization of Usama Bin Laden, but was not part of the formal al Qaeda network.

In March 2003, at Dr. Atalla's invitation, Dr. Chehade came to Missouri and presented a time management seminar at the Islamic Center.  While there, Dr. Chehade and his family stayed at Dr. Atalla's home.

On July 6, 2004, Special Agent Andrew R. Ryder of the FBI and Assistant United States Attorney Anthony Gonzalez interviewed Dr. Atalla in Columbia, Missouri, in the presence of his attorney.  In that unrecorded interview, Dr. Atalla stated that he had made contributions to the Global Relief Foundation, the Holy Land Foundation, the Benevolence International Foundation, and the Islamic African Relief Agency.

In addition to his donations to the Global Relief Foundation, Dr. Atalla made donations to the Holy Land Foundation, Benevolence International Foundation, and the Islamic African Relief Agency at times when they were recognized by the United States as 501(c)(3) organizations.  Dr. Atalla was not a member of the Holy Land Foundation, Benevolence International Foundation, or the Islamic African Relief Agency.  He does not believe that his donations to or involvement with any of these organizations constituted being "associated" with them.

### C.     Dr. Atalla's Application for Naturalization

On May 12, 1997, Dr. Atalla became a lawful permanent resident of the United States.  On May 5, 2002, Dr. Atalla filed an Application for Naturalization, INS Form N-400, with U.S. Citizenship and Immigration Services ("USCIS").  Dr. Atalla wrote in black ink on his application.  Among other things, he indicated that he had traveled to Syria in 1997 and 2000, Saudia Arabia in 1998, and Azerbaijan in 2000.

The Form N-400 included the following question 8(a):  "Have you EVER been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?"  In response, Dr. Atalla marked an "X" in the box for "Yes."  Question 8(b) stated:  "If you answered 'Yes,' list the name of each group below.  If you need more space, attach the names of the other group(s) on a separate sheet of paper."  In response, Dr. Atalla wrote:  "American College of Physicians."[2]  Question 9(c) stated:  "Have you EVER been a member of or in any way associated *(either directly or indirectly)* with: . . . A terrorist organization?"  In response, Dr. Atalla marked an "X" in the box for "No."  Question 16 stated:  "Have you EVER been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason?"  In response, Dr. Atalla marked an "X" in the box for "No."[3]  Question 23 stated:  "Have you EVER given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?"  In response, Dr. Atalla marked an "X" in the box for "No."

---

[2]Later, during a naturalization interview, the interviewer wrote the names of ten additional organizations in the space for responding to question 8(b).

[3]During a naturalization interview, Dr. Atalla provided updated information regarding traffic violations in 2005, 2007, and 2008, and changed his response to question 16 to "Yes."

1    USCIS interviewed Dr. Atalla regarding his application for naturalization on May

2    27, 2004, July 17, 2006, and June 12, 2008.  During the interviews, USCIS officers wrote

3    in red ink on Dr. Atalla's Form N-400 application, adding information, circling some of

4    the question numbers and Dr. Atalla's responses, and placing check marks by some of the

5    responses.  Many of the responses are circled and have two check marks, which indicates

6    that all three interviewers asked Dr. Atalla to confirm his response to the related question,

7    but does not indicate whether each or any of the interviewers read the entire question

8    exactly as printed on the form.  On Dr. Atalla's Form N-400 application, his response

9    ("Yes") to question 8(a) is circled and does not have any checkmarks.  There are no

10   checkmarks next to his response to question 8(b) or the information added by the

11   interviewer(s) to his response.  Question 9(c) is circled, and Dr. Atalla's response ("No")

12   is circled with two checkmarks.  Question 16 is circled, Dr. Atalla's initial response

13   ("No") is changed to "Yes," followed by two checkmarks.  In question 16, the word

14   "cited" is circled, and information about three traffic violations in 2005, 2007, and 2008

15   has been added in red ink.  Question 23 is circled, and Dr. Atalla's response ("No") is

16   circled with two checkmarks.

17   On September 10, 2008, USCIS denied Dr. Atalla's application for naturalization

18   based on a finding of lack of good moral character.  On October 9, 2008, Dr. Atalla

19   administratively appealed his naturalization denial by filing a Request for Hearing, INS

20   Form N-336.

21   On April 7, 2009, USCIS affirmed the denial of Dr. Atalla's application for

22   naturalization due to failure to establish good moral character.  The N-336 Hearing

23   Decision stated that Dr. Atalla had provided false information to obtain an immigration

24   benefit on his application for naturalization and during his naturalization interviews by

25   failing to disclose he had been interviewed by Customs and Border Protection officers

26   upon his return from overseas travel on August 23, 2004, July 5, 2005, and July 6, 2006,

27

28                                          - 9 -

and by the FBI on July 6, 2004.[4]  The N-336 Hearing Decision also states that Dr. Atalla "failed to disclose [his] association with numerous organizations with ties to terrorism" and that "[o]ne who contributes funds to an organization does have an association with that organization."  The reviewing officer concluded that Dr. Atalla added to his application the names of organizations with no terrorist ties as "a deliberate attempt to conceal [his] affiliation with the other terrorist organizations" to which he had donated.

On August 4, 2009, Dr. Atalla filed the present action seeking a hearing *de novo* on his application for naturalization pursuant to 8 U.S.C. § 1421(c).

**D.     Dr. Atalla's Sworn Oral Statements[5]**

**1.     May 27, 2004**

On May 27, 2004, USCIS Officer Kirk R. Wills interviewed Dr. Atalla in Kansas City, Missouri, regarding Dr. Atalla's application for naturalization.  The interview was recorded by electronic sound recording and later transcribed.  Officer Wills placed Dr. Atalla under oath at the beginning of the naturalization interview.  He did not ask Dr. Atalla whether everything in his application was true and complete to the best of his knowledge, but he did ask questions regarding many of Dr. Atalla's responses in the application.

Officer Wills asked Dr. Atalla about his trips out of the country and added to the application information regarding trips that Dr. Atalla had made since he had completed the application in May 2002.  He asked Dr. Atalla about the purpose of his trips to Syria, Saudi Arabia, and Azerbaijan.  He asked some, but not all, of the questions in the application and did not ask all of them exactly as written.  For example, Officer Wills

---

[4]Neither the application nor the transcript interviews, however, indicate that Dr. Atalla was asked whether he had been "interviewed."

[5]Dr. Atalla's pretrial deposition was not offered or admitted in evidence during the evidentiary hearing although USCIS subsequently attached it as an exhibit to the Supplemental Brief of Respondents.

asked, "Have you ever claimed to be a United States citizen?" although the application stated, "Have you EVER claimed to be a United States citizen *(in writing or any other way)*?"  Similarly, Officer Wills asked, "Have you ever voted in a United States election?" although the application stated, "Have you EVER voted in any Federal, state, or local election in the United States?"  Also, Officer Wills asked, "Have you ever been arrested by the police for any reason?" although question 16 on the application stated, "Have you EVER been arrested, cited, or detained by any law enforcement officer (including INS and military officers) for any reason?"

Officer Wills did not read to Dr. Atalla question 8(a), which stated, "Have you EVER been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?"  Instead, he asked, "Are you a member of any clubs, organizations, or social groups?"  Dr. Atalla responded with the names of some medical organizations and said he did not know whether the interviewer wanted to hear all of the medical organizations of which he was a member.  Instead of asking for the names of all of the organizations of which Dr. Atalla was a member or asking Dr. Atalla whether he was associated with any other organizations, the interviewer just moved on to his next question.

Officer Wills also did not read to Dr. Atalla question 9, which stated:

Have you EVER been a member of or in any way associated with *(either directly or indirectly)* with:

      a.     The Communist Party?

      b.     Any other totalitarian party?

      c.     A terrorist organization?

Instead, Officer Wills asked, "Have you ever been a member of the Communist Party?"; "Have you ever been a member or in any way associated with any totalitarian political party?"; and "Have you ever been a member or in any way associated with any terrorist

1  organization?"  After receiving negative responses to all three questions, Officer Wills

2  asked Dr. Atalla about his involvement with the Global Relief Foundation:

3          Q.      Okay.  Now, are you aware that there's certain charities that
        have been designated as terrorist organizations?

4

5          A.      Correct.

6          Q.      Okay.  Have – what do you know about an organization called
        the – I believe it's called the Global Relief Foundation –

7          A.      Um-hmm.

8          Q.      – out of Chicago, Illinois?

9          A.      Global Relief Foundation is an organization that – it occurred
        that they came and raised funding in communities that I was involved.

10

11         Q.      Okay.

         A.      I – knew – I knew the chairperson of that organization –

12         Q.      Okay.

13
         A.      – just from him coming and visiting us.  And he got me, you
14      know – I mean, he became just a –

15         Q.      Okay.

16         A.      – distant friend and –

17         Q.      Okay.  Do – what did – what did you do?  Did you ever
        donate money to them or –

18

19         A.      I did.

         Q.      Okay.  You've never actually been a member.  Is that right?
20      You just donated money to them?

21         A.      Donated money, yeah.

22         Q.      Okay.  Have you ever raised money for them?

23         A.      At a local level.  Like, when they come in and I help out and
        volunteer.

24
         Q.      Okay.  Do you mind if I take a statement from you in regards
25      to your involvement with them?

26         A.      No.

27

28
                                    - 12 -

1     Q.    Okay.  Now, before we – before I do that, I would like to finish the questions –

2

3     A.    Sure.

Q.    – here on your application and then I'll take the statement at the end.  Okay?

Have you ever participated in the persecution of any individual because of their race, ethnic group, religion, or political opinion?

A.    Never.

Q.    Okay.  Have you ever been arrested by the police for any reason?

A.    Never.

. . . .

Q.    Okay.  Have you ever given false or misleading information to an immigration officer or any other U.S. government official, to obtain a visa?

A.    Never.

Q.    Have you ever lied on [*sic.*] an immigration officer or any other U.S. government official for any reason whatsoever?

A.    Never.

Then Officer Wills said that he would like to take a statement from Dr. Atalla at the end of the interview regarding his involvement with the Global Relief Foundation. After asking Dr. Atalla additional questions, Officer Wills prepared a statement of questions and answers for Dr. Atalla to review before signing.  One of the questions Officer Wills asked about the Global Relief Foundation was, "Have you ever been a member, donated money to, or raised funds for this organization?"  Dr. Atalla responded that he had donated money and raised funds for the Global Relief Foundation, but he had never been a member.  He said that the trip he took to Azerbaijan to help set up a medical clinic was for the Global Relief Foundation.  He also said that the funds he helped raise were for purchasing medical supplies and for the Global Relief Foundation's medical program in which he participated.  Dr. Atalla told Officer Wills that he kept in contact

1   with the Global Relief Foundation's chairperson, Mohamad Chehade, and called him as a

2   friend every couple of months or so.

3        Officer Wills asked Dr. Atalla when he first became "aware of the accusations

4   about the Global Relief Foundation's connections to terrorism."  Dr. Atalla responded

5   that he learned about it from the media post-September 11.  Dr. Atalla also said that he

6   did not continue to donate money or participate in fundraising activities for the Global

7   Relief Foundation after he became aware of the accusations.  However, the next day, on

8   May 28, 2004, Dr. Atalla sent a letter to Officer Wills amending his sworn statement.  He

9   said that he had reviewed his records and found that he had written two checks in 2002

10  for the Global Relief Foundation's legal defense fund, which he believed to be

11  government authorized according to the mass mail he had received from the Global Relief

12  Foundation asking for help at that time.

13       In summary, Officer Wills did not ask Dr. Atalla whether he had ever been

14  "associated with" any organization or group, only whether he had been a "member" of

15  any organization or group.  Officer Wills asked Dr. Atalla whether he had "ever been a

16  member or in any way associated with any terrorist organization," but he did not say

17  "directly or indirectly."  Officer Wills indicated that he knew Dr. Atalla had been

18  involved with the Global Relief Foundation, and Dr. Atalla answered Officer Wills'

19  questions about the Global Relief Foundation and its designation as a terrorist

20  organization.  Officer Wills asked Dr. Atalla, "Have you ever been *arrested* by the police

21  for any reason?" but did not ask whether he had ever been *cited* or *detained* by any law

22  enforcement officer.  He did not ask Dr. Atalla whether he had ever been *interviewed* by

23  any law enforcement officer.  Officer Wills asked Dr. Atalla, "Have you ever given false

24  or misleading information to an immigration officer or any other U.S. government

25  official, to obtain a visa?" but did not ask whether he had given false or misleading

26  information "while applying for any immigration benefit."  Officer Wills asked Dr. Atalla

27

28                                    - 14 -

1   whether he had "lied" to a U.S. government official, but did not ask whether he had ever

2   "misled" a U.S. government official.

3        With the exception of whether he had continue to donate money or participate in

4   fundraising activities for the Global Relief Foundation after he became aware of

5   accusations that it had terrorist connections, Dr. Atalla answered all of Officer Wills'

6   questions truthfully.  After searching his financial records, Dr. Atalla corrected his

7   incorrect answer the day after the interview.

8                    **2.      July 17, 2006**

9        On July 17, 2006, USCIS Officer Tina M. Richmond interviewed Dr. Atalla in

10  Cincinnati, Ohio.  The interview was not recorded.  On November 5, 2009, Officer

11  Richmond executed a declaration stating that she had interviewed Dr. Atalla on July 17,

12  2006, at the USCIS office in Cincinnati, Ohio, and that the declaration is based on her

13  personal knowledge and review of official documents maintained by the USCIS.  The

14  declaration states that the 2006 interview was necessary even though Dr. Atalla had been

15  interviewed on May 27, 2004, because the "processing work sheets were not filled out."

16       The declaration further states that Officer Richmond placed Dr. Atalla under oath

17  for the July 17, 2006 interview and asked him "whether he had ever been a member of or

18  associated with any organization, association, fund, foundation, party, club, society, or

19  similar group in the United States"; "whether he had ever been a member of or in any way

20  associated, either directly or indirectly with any terrorist organization"; "whether he had

21  ever been arrested, cited, or detained, by any law enforcement officer, which would

22  include immigration, customs or military officers, for any reason"; and "whether he had

23  ever given false or misleading information to any U.S. government official, while

24  applying for an immigration benefit or to prevent deportation, exclusion, or removal."

25  The declaration states that Officer Richmond knows she asked Dr. Atalla these questions

26  because "it is [her] standard practice to ask these questions during every naturalization

27  interview, and [she] recognize[d] [her] marks on [Dr.] Attala's INS Form N-400

28                              - 15 -

indicating that [she] did in fact ask [Dr.] Atalla the above questions." The declaration does not state that it is Officer Richmond's practice to read each question on the form exactly as it is written.

Officer Richmond's declaration also states that there is no indication on the Form N-400 that Dr. Atalla disclosed that he was interviewed by customs officials on August 23, 2004, July 5, 2005, or July 6, 2006, or by the FBI on July 12, 2004. Officer Richmond declares that if Dr. Atalla had disclosed these contacts with law enforcement officers, she would have questioned him about these encounters. But the declaration does not state that Officer Richmond asked Dr. Atalla whether he had ever been interviewed by any law enforcement officer.

When Officer Richmond interviewed Dr. Atalla in 2006, his file contained his May 27, 2004, sworn statement regarding his involvement with the Global Relief Foundation and his May 28, 2004 letter regarding his donations to the Global Relief Foundation. Officer Richmond's declaration does not state whether she questioned Dr. Atalla about his involvement with the Global Relief Foundation.

Because the 2006 interview was not recorded, it is impossible to determine the precise questions Officer Richmond asked Dr. Atalla or his responses. Officer Richmond does not actually remember her interview of Dr. Atalla and relies on her standard practice to make the assumption that she asked certain questions exactly as written on the Form N-400. However, the transcripts of the 2004 and 2008 interviews demonstrate that some USCIS interviewers do not read each and every question as it is written on the Form N-400.

### 3.    June 12, 2008

On June 12, 2008, USCIS Officer Mario A. Jimenez interviewed Dr. Atalla in Phoenix, Arizona, regarding Dr. Atalla's application for naturalization. The testimony was recorded by electronic sound recording and later transcribed. Officer Jimenez placed Dr. Atalla under oath at the beginning of the naturalization interview. He did not ask Dr.

Atalla whether everything in his application was true and complete to the best of his knowledge.  He did not ask Dr. Atalla on the record to orally certify that the answers contained in his application for naturalization were true and correct under penalty of perjury, but Dr. Atalla did sign and date the written certification portion of the application.  At the conclusion of the interview, Officer Jimenez asked Dr. Atalla whether he had any questions or anything to add to the record, and Dr. Atalla said that he did not.

Officer Jimenez asked Dr. Atalla whether he had "ever been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place."  After Dr. Atalla responded, "Yes," Officer Jimenez read the names of the associations listed on Dr. Atalla's application, which included both medical and Islamic organizations.  Dr. Atalla added the Islamic Society of Greater Dayton and the Greater Dayton Islamic Foundation to the list.

Officer Jimenez then asked Dr. Atalla:

> Q.     Have you ever been a member of or in any way associated, either directly or indirectly, with the communist party?
>
> A.     No.
>
> Q.     Any other totalitarian party?
>
> A.      No.
>
> Q.     Any terrorist organization?
>
> A.     No.

Officer Jimenez also asked:  "Have you ever been arrested, cited, in other words, received a citation, or detained by any law enforcement officer, including immigration, customs or military officers, for any reason?"  Dr. Atalla responded, "Including traffic?"  Dr. Atalla then responded to questions about his traffic violations.  In 2005, he received a speeding ticket in Akron, Ohio.  In late 2007, he received a ticket for driving too slow, unsuccessfully appealed it in court, and paid the ticket.  In March 2008, Dr. Atalla

- 17 -

1   received a citation for red light violation based on a traffic camera, which was dismissed

2   after Dr. Atalla attended traffic school.[6]

3          Officer Jimenez asked Dr. Atalla, "Have you ever given false or misleading

4   information to any U.S. government official, while applying for an immigration benefit or

5   to prevent deportation, exclusion, or removal?"  Dr. Atalla responded, "No."

6          Officer Jimenez also reviewed with Dr. Atalla his 2004 sworn statement regarding

7   his involvement with the Global Relief Foundation.  With respect to specific questions

8   presented in the 2004 statement, Officer Jimenez asked Dr. Atalla if responses stated in

9   the 2004 statement were the responses he gave, and each time Dr. Atalla said it did.  Then

10  Officer Jimenez said he was going to ask additional follow-up questions that had not been

11  asked previously.  Officer Jimenez asked Dr. Atalla, "Have you sent any more money or

12  donated funds to any other type of relief organizations?"  Dr. Atalla responded

13  affirmatively and identified Mercy International, Islamic African Relief, and Indian

14  Education Student Fund.

15         In response to questions about the Global Relief Foundation, Dr. Atalla again

16  explained that in 2000 he went to Baku, Azerbaijan, to help the Global Relief Foundation

17  supervise the initiation of a medical clinic and to bring medical equipment and supplies

18  for the clinic.  Dr. Atalla again stated that he had communicated with Mohamad Chehade

19  regarding the trip and subsequently had kept contact with him as a friend.  Dr. Atalla

20  stated that he had lost contact with Dr. Chehade a few years before the 2008 interview.

21  When asked about his function with the Global Relief Foundation, Dr. Atalla said he was

22  a volunteer:

23              Q.    Going back to this GRF, what was your function within the
               organization?  Just fundraiser?
24

25         [6]During Dr. Atalla's pretrial deposition, he explained that he was selected for
    additional airport screening on his return trips from Syria in 2004, 2005, and 2006, which
26  he did not consider detention.  USCIS did not offer any evidence at trial regarding this
    issue.
27

28                                        - 18 -

1

2

A.      Volunteer, just volunteer.

Q.      Just volunteering?

3

4

A.      Yeah.  I mean, the fundraising that I did was particularly with the trip that I made, so I wanted –

5

6

Q.       Okay.  Was that the only fundraising you did, was for that trip?

7

A.      That was the only – that's the only fundraising that I did with them.

8       Next, Officer Jimenez questioned Dr. Atalla about whether he had attended any

9    meetings at the Global Relief Foundation or a conference.  Dr. Atalla responded that he

10   had attended a conference in Chicago as a guest.

11       Officer Jimenez also asked Dr. Atalla questions regarding his fundraising activities

12   and contributions to Global Relief Foundation's legal defense fund.  Officer Jimenez

13   asked whether Dr. Atalla believed that the Global Relief Foundation had connections to

14   terrorism:

15

Q.      Do you believe that the GRF had any terrorist ties?

16

A.      I don't.  I mean, otherwise I would have not.

17

Q.      Okay.  And now, do you believe the GRF had any terrorist ties?

18

19

A.      I – I really don't.  I mean, I – how I (indiscernible), like, you know, whatever the investigation should reveal, reveals.

20

Q.      Right.

21

A.      You know, but I – knowing them, I – I don't think – I mean, knowing that person, he's not a person of –

22

Q.      This Chehade?

23

24

A.      Chehade.  I mean, he's a – he's an MBA graduate.  He writes books.  He – he's an upright person.  That's not his belief.  So I really don't.

25

Q.      What kind of books does he write?

26

A.      He – he wrote a book on time management.

27

28

When Officer Jimenez asked Dr. Atalla if he ever had considered himself to be a member of the Global Relief Foundation, Dr. Atalla said, "I was not a member." He also said that he was not "the official fundraiser" and that he did not ever attend any staff meetings.

Finally, Officer Jimenez asked Dr. Atalla what organizations had he donated to since he could no longer donate to the Global Relief Foundation. Dr. Atalla said, as far as relief organizations, he donated to the organizations he had identified earlier. He said he also donates to local Islamic centers in any city that he goes to and to charitable organizations, such as the cancer society and for handicapped children.

To the extent that Dr. Atalla's answer regarding whether he had ever been associated with any terrorist organization was incorrect because of his involvement with the Global Relief Foundation, any error was corrected by his responses to Officer Jimenez's further questioning. All of Dr. Atalla's other responses to Officer Jimenez's questions were truthful.

## II.   Evidentiary Rulings

### A.   USCIS's Alternative Defense that Dr. Atalla Committed Crimes of Moral Turpitude

At the March 24, 2011 pretrial conference, Dr. Atalla's counsel objected to USCIS's intent to argue that Dr. Atalla be denied naturalization because he had committed crimes of moral turpitude, *i.e.*, making false statements on his naturalization application, perjury, and providing material support to a terrorist organization. USCIS first raised this argument on March 22, 2011, in its trial brief and proposed findings of fact and conclusions of law. USCIS's counsel contended that this alternative defense was based on the same facts as its primary defense, *i.e.*, that Dr. Atalla had given false testimony under oath with the subjective intent to obtain immigration benefits, and therefore did not require timely disclosure.

1    The Court concluded that the defense regarding crimes of moral turpitude could

2    have been disclosed before the close of discovery and the untimely disclosure was

3    unjustified and prejudicial to Dr. Atalla.  New accusations of criminal activity, such as

4    providing material support to a terrorist organization, would require additional discovery

5    and cause further delay in naturalization proceedings that already span nearly nine years.

6    The Court, therefore, excluded the untimely raised issue of whether Dr. Atalla had

7    committed a crime of moral turpitude.

8                    **B.       Admission of FISA Intercepts, Exhibits 157-199**

9    Before and at trial, Dr. Atalla's counsel objected to the admission of numerous

10   Foreign Intelligence Surveillance Act ("FISA") intercepts of telephone communications

11   because they were disclosed after Dr. Atalla's deposition and some of the translations

12   were not produced until after the close of discovery.  On August 31, 2010, counsel for

13   USCIS first discovered the existence of classified FISA intercepts of telephone

14   communications made in 2000 and 2001 in which Dr. Atalla participated or that

15   mentioned his name.  Authority to use this classified information in this case was

16   requested on October 26, 2010, and granted on November 1, 2010.  Dr. Atalla was

17   deposed on November 2, 2010.  The intercepts were translated from Arabic to English,

18   and verbatim translations were finalized on December 9, 2010, and produced to Dr. Atalla

19   on December 10, 2010.  On January 10, 2011, additional intercepts were found, and

20   summaries of the additional intercepts were produced on February 8, 2011, before the

21   discovery deadline, which had been extended to February 14, 2011.  Verbatim

22   translations of the second set of intercepts were produced on March 16, 2011.

23   When Dr. Atalla was deposed on November 2, 2010, he and his counsel were not

24   aware of the FISA intercepts or that counsel for USCIS had received authority to use

25   them and knew of the contents of the intercepts.  During his deposition, Dr. Atalla was

26   questioned about numerous items mentioned in the FISA intercepts.  Subsequently, Dr.

27   Atalla listened to the audio recordings of the FISA intercepts, compared them to the

28                                                     - 21 -

1   translations, and did not disagree with the accuracy of the translations.  Moreover, Dr.

2   Atalla believed that the content of the FISA intercepts not only was unlikely to be

3   prejudicial at trial, but actually corroborated his testimony.

4        Dr. Chehade also reviewed all of the FISA intercept audio files that USCIS

5   intended to introduce as evidence in this case.  He personally listened to all of the

6   recordings and certified they were fair and accurate recordings of the conversations in

7   question.  He also confirmed the identities of the speakers in the recordings.

8        Therefore, at trial, the FISA intercepts were admitted, but subject to further

9   consideration of any unfairness imposed by the timing of their disclosure and production

10  to Dr. Atalla.  Because the intercepts corroborate Dr. Atalla's testimony, the Court finds

11  that the timing of their disclosure does not unduly prejudice Dr. Atalla and their

12  admission does not impose any unfairness.

13  **III.    Conclusions of Law**

14       **A.    Legal Standard**

15  "No alien has the slightest right to naturalization" unless he strictly complies with

16  all statutory requirements.  *Fedorenko v. U.S.*, 449 U.S. 490, 506 (1981) (quoting *United*

17  *States v. Ginsberg*, 243 U.S. 472, 474-75 (1917)).  To be eligible for naturalization, an

18  applicant must establish certain residency requirements, physical presence in the United

19  States for a requisite period, and a showing of good moral character.  *See* 8 U.S.C.

20  § 1427.  The only contested issue here is Mr. Atalla's ability to demonstrate his good

21  moral character for the relevant statutory period, which runs from the five years

22  immediately preceding the filing of his naturalization application until the oath of

23  allegiance is administered.  *See* 8 C.F.R. § 316.10(a)(1); *United States v. Dang,* 488 F.3d

24  1135, 1139 (9th Cir. 2007).  The Court must "evaluate claims of good moral character on

25  a case-by-case basis," considering certain statutory restrictions and "the standards of the

26  average citizen in the community of residence."  8 C.F.R. § 316.10(a)(2).  The Court must

27  make a determination regarding the applicant's moral character during the statutory

28

period, but it "may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to [the statutory] period." *Id.*

While Congress has not "specifically define[d] what 'good moral character' is," *United States v. Jean-Baptiste*, 395 F.3d 1190, 1193 (11th Cir. 2005), it has established certain standards for determining when an applicant for naturalization cannot be found to have the requisite "good moral character." *See* 8 U.S.C. § 1101(f).  For example, Congress determined that any person who is a habitual drunkard, whose income is derived principally from illegal gambling activities, who has been convicted of an aggravated felony, or who has given false testimony for the purpose of obtaining any immigration benefit shall be found to lack good moral character and is accordingly ineligible for naturalization.  *Id.*  Here, the only dispute is whether Dr. Atalla has given false testimony for the purpose of obtaining any immigration benefit.

For an applicant's false testimony to preclude a finding of good moral character under 8 U.S.C. § 1101(6), "the testimony must have been made orally and under oath, and the witness must have had a subjective intent to deceive for the purpose of obtaining immigration benefits."  *Ramos v. INS*, 246 F.3d 1264, 1266 (9th Cir. 2001).  Statements made to an INS officer in a naturalization examination constitute testimony.  *Id.*

The statute does not distinguish between material and immaterial false testimony. *Kungys v. United States*, 485 U.S. 759, 779 (1988).  Lack of good moral character "appears to some degree whenever there is a subjective intent to deceive, no matter how immaterial the deception."  *Id.* at 780.  "[U]nlike the misrepresentation clause of § 1451(a), the false testimony provisions of § 1101(f)(6) do not apply to 'concealments.'" *Id.* at 781.

The applicant for naturalization must "bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization."  8 C.F.R. § 316.2(b); *accord United States v. Hovsepian*, 359 F.3d 1144,

1168 (9th Cir. 2004).  But the applicant also must prove good moral character "in every

respect":

> When the Government seeks to strip a person of citizenship already
> acquired, or deport a resident alien and send him from our shores, it carries
> a heavy burden of proving its case by clear, unequivocal, and convincing
> evidence.  But when an alien seeks to obtain the privileges and benefits of
> citizenship, the shoe is on the other foot.  He is the moving party,
> affirmatively asking the Government to endow him with all the advantages
> of citizenship.  Because that status, once granted, cannot lightly be taken
> away, the Government has a strong and legitimate interest in ensuring that
> only qualified persons are granted citizenship.  For these reasons, it has
> been universally accepted that the burden is on the applicant to show his
> eligibility in every respect.  This Court has often stated that doubts should
> be resolved in favor of the United States and against the claimant.

*Berenyi v. INS*, 385 U.S. 630, 636-37 (1967) (internal citations and quotation marks

omitted).

The parties dispute whether Dr. Atalla must prove good moral character by "clear

and convincing evidence" or by a "preponderance of the evidence."  Dr. Atalla has the

better of the argument as a matter of controlling authority, but the distinction does not

matter in this case.  The Court is clearly convinced on the dispositive facts and inferences

found herein.  Dr. Atalla must prove that he did not give *any* false oral testimony under

oath with the subjective intent to deceive for the purpose of obtaining immigration

benefits:

> The reason for denying naturalization whenever false testimony is
> given in an attempt to gain it goes beyond a judgment that one who gives
> false testimony to deceive the government is by that fact unworthy of the
> privileges of citizenship; it is also based on the practical ground that a false
> answer to a query which on its face appears innocuous may effectively cut
> off a line of inquiry which might have revealed further facts bearing on the
> petitioner's eligibility for citizenship.  Having asked a question which it
> deems significant to determine the qualifications of one seeking citizenship,
> the government is entitled to full disclosure.

*In re Haniatakis*, 376 F.2d 728, 730 (3d Cir. 1967).  The high level of honesty required

may entail a firm conviction of that honesty even within the "preponderance of the

evidence" test.  A thorough study of all the evidence leaves the Court with that

conviction.

1

**B.    Dr. Atalla Did Not Give False Oral Testimony Under Oath Nor with the Subjective Intent to Deceive for the Purpose of Obtaining Immigration Benefits.**

2

3       Although donating to an organization does not make one a "member of or

4    associated with" the organization, Dr. Atalla's involvement with the Global Relief

5    Foundation included much more than donations.  He raised funds for it, provided

6    volunteer services under its auspices, and sought to perform an even more active role with

7    Global Relief Foundation.  The phrase "associated with" has diverse enough meanings in

8    the abstract to encompass Dr. Atalla's actions with respect to the Global Relief

9    Foundation, and the phrase is not defined by federal statute or regulation.  However, it is

10   not necessary to determine whether Dr. Atalla is chargeable with every reasonable

11   meaning, or even the most common meaning, of "associated with" in addition to his own

12   reasonable meaning because Dr. Atalla did not give false oral testimony under oath.  As

13   found above, in each of the naturalization interviews that were recorded and transcribed,

14   Dr. Atalla accurately answered the precise questions posed to him.

15       Further, even if Dr. Atalla should have said that he was "associated" with the

16   Global Relief Foundation, his denial of any "association" was not made with the

17   subjective intent to deceive for the purpose of obtaining immigration benefits.  Beginning

18   with his first naturalization interview, Dr. Atalla disclosed that he traveled to Baku,

19   Azerbaijan, to assist the Global Relief Foundation in establishing a medical clinic there.

20   He also disclosed that he donated money multiple times to the Global Relief Foundation

21   and raised funds for the Global Relief Foundation's medical relief programs.  Even if he

22   should have thought that his level of involvement with the Global Relief Foundation

23   counted as being "associated" with it, his specific disclosures were far more important

24   than this quarrel over what label to put on those disclosures.  In light of those disclosures

25   and the totality of evidence, failing to label those specifics as "association" was not done

26   with intent to deceive.  Further, Dr. Atalla provided the USCIS enough information about

27   his involvement with the Global Relief Foundation that failure to label their relationship

28

1   as an "association" did not cut off any line of inquiry that might have revealed further

2   facts bearing on his eligibility for citizenship.

3        In *Del Guercio v. Pupko*, the applicant orally denied under oath having been

4   arrested or charged with violation of any law of the United States or state or any city

5   ordinance although she had previously been charged with and convicted of two charges.

6   160 F.2d 799, 799 (9th Cir. 1947).  She later admitted that she had decided not to reveal

7   the truth because she thought her application would be denied immediately if she were

8   truthful, and she thought that if the INS did learn of the convictions, she would have a

9   chance to explain the them.  *Id.* at 799-800.  Therefore, the Ninth Circuit reversed her

10  admission to citizenship.  *Id.* at 800.  In contrast, Dr. Attala disclosed his donations to and

11  volunteering for the Global Relief Foundation during his first interview.  He could not

12  have reasonably  thought he would avoid scrutiny of his involvement with the Global

13  Relief Foundation by failing to label it as an organization with which he was

14  "associated."

15       USCIS repeatedly argues that Dr. Atalla lied about being associated with Global

16  Relief Foundation based on his rejection of the label "associated with," but it disregards

17  Dr. Atalla's detailed answers in the same interview and in earlier interviews.  This Court

18  takes each of Dr. Atalla's interviews as a whole, and each in light of his detailed answers

19  in prior interviews given to USCIS over four years.  USCIS's attempt to find deception by

20  ignoring the most important parts of what was said does not comport with the reality of

21  oral communication or with common sense.

22       Further, to the extent USCIS contends that Dr. Atalla failed to disclose an

23  "association with" the Holy Land Foundation, Benevolence International Foundation, or

24  the Islamic African Relief Agency, Dr. Atalla's involvement with these organizations was

25  limited to making monetary donations to them before they were designated as having ties

26  to terrorism.  Dr. Atalla did not give false testimony by failing to define his involvement

27  with these organizations as being "associated with" them.

28

1    The Court finds by clear and convincing evidence, though that standard is not

2    required, that Dr. Atalla did not give false testimony or give false testimony with the

3    subjective intent to obtain an immigration benefit.  It further finds that he has proved his

4    good moral character to the same standard.

5    IT IS THEREFORE ORDERED that Plaintiff's application for naturalization is

6    granted.  The Clerk shall enter judgment granting Plaintiff's application for

7    naturalization.  The Clerk shall terminate this case.

8    DATED this 20th day of June, 2011.

9

10   _____

11   Neil V. Wake
     United States District Judge

- 27 -